PER CURIAM OPINION
{¶ 1} Appellant, Ronald Dudas, appeals the order of the Lake County Court of Common Pleas dismissing his petition for post conviction relief. Appellant was convicted following his guilty plea to intimidation of a Cuyahoga County Common Pleas Court Judge and engaging in a pattern of corrupt activity involving the theft of money and real estate from numerous victims. In his motion appellant alleged that he had been set up, that his trial counsel was ineffective, and that the state seized evidence *Page 2 
from him in violation of his Fourth Amendment rights. For the reasons that follow, we affirm.
 {¶ 2} On October 19, 2005, Cuyahoga County Common Pleas Judge David T. Matia sentenced appellant to 17 months in prison subsequent to his guilty plea to felony theft and for a probation violation.
 {¶ 3} Immediately after appellant was taken by sheriff's deputies to the Cuyahoga County Jail, appellant started making collect telephone calls to his girlfriend Jennifer Bost discussing his sentencing. On October 19, 2005, he told her he was "gonna visit [North Olmsted Police Detective Simon Cesareo] when "I'm out of here." He said, "I want [Detective Cesareo] sodomized." This detective had investigated many of the fraud cases over the past ten years that had resulted in convictions against appellant.
 {¶ 4} On October 21, 2005, appellant called Ms. Bost again. While discussing his sentence with her, he said he "was gonna take that gun from the deputy and shoot the fucker [Judge Matia] in the head."
 {¶ 5} Between October 19, 2005 and October 21, 2005, appellant also discussed his sentencing with some of his fellow inmates. He told inmate Daniel Whitehead that because Judge Matia gave him almost the maximum sentence, he took it personally and wanted Judge Matia to be killed and wanted Detective Cesareo to be hurt. He offered to pay Whitehead $10,000 to accomplish this, but Whitehead declined.
 {¶ 6} On October 22, 2005, appellant told inmate Robert Harmon he hated Judge Matia and wanted him killed and wanted Detective Cesareo's legs broken. *Page 3 
Appellant told him he would pay him $500 now, $5,000 when Harmon got out of jail, and a final $5,000 when Harmon had done it.
 {¶ 7} Harmon later contacted Cleveland Police Homicide Detective Hank Veverka and told him about appellant's threat. Harmon agreed to wear a recording device. On October 25, 2005, appellant again discussed the murder plot with Harmon, only this time the conversation was tape-recorded. Appellant told Harmon how he would get the money; that he guaranteed Harmon he would be paid; and that he wanted both jobs done, referring to Judge Matia and Detective Cesareo.
 {¶ 8} On or about November 20, 2005, appellant contacted Tom Platzer, one of his victims, and convinced him to give $300 to Harmon, which appellant meant to serve as the initial deposit for Harmon's role in the plot. Platzer paid the money to a detective posing as Harmon.
 {¶ 9} On November 23, 2005, appellant told Ms. Bost he had gotten in trouble in the past with a note he had written and this time he had done "the reverse." He had gone to Harmon's cell and found a prescription for his medication. Appellant took the prescription and wrote a note on the back stating, "I, Robert Harmon, hereby state that I falsely tried to set up Ronald Dudas to enhance myself. I have told several lies to detectives about Ron Dudas. I sign this note because I was wrong for what I did." The note was dated November 23, 2005, and bore the purported signature of Harmon. Appellant said this was his protection in the event Harmon turned out to be an informant. Appellant mailed this note to Ms. Bost, and told her with this he had the upper hand. Detectives turned the note over to the Lake County Crime Lab, which *Page 4 
determined that appellant himself had written the note and that Harmon's signature on the note was a forgery.
 {¶ 10} On April 18, 2006, appellant was indicted by the Cuyahoga County Grand Jury with 14 counts of intimidation, in violation of R.C.2921.03; 15 counts of retaliation, in violation of R.C. 2921.05; two counts of conspiracy to commit aggravated murder, in violation of R.C.2903.01 and 2923.01; attempted aggravated murder, in violation of R.C.2903.01 and 2923.02; and attempted felonious assault on a police officer, in violation of R.C. 2903.11 and 2923.02 ("the murder conspiracy case").
 {¶ 11} Further, between June, 2000 and April, 2002, appellant formed and carried on an enterprise for the ostensible purpose of providing loans to individuals in desperate financial straits, but with the true purpose of stealing their funds and real estate. Appellant employed various schemes to accomplish this objective. Many of appellant's victims were near foreclosure, and appellant took advantage of their plight by stealing the last of their assets. Appellant recruited associates to act as straw borrowers and purchasers and created spurious mortgages and loan documents to obtain loans from lenders. He then stole the proceeds from these loans.
 {¶ 12} Pursuant to this enterprise, appellant forged signatures on conveyance instruments and mortgages and falsified loan applications in order to obtain loans. He prepared and filed fraudulent mechanics' liens against properties, and falsified documents that allowed him to collect on them. He stole in excess of one million dollars from multiple victims. The indictment listed 35 victims. He stole more than $100,000 apiece from 14 separate victims. *Page 5 
 {¶ 13} Appellant would often convince victims, many of whom were elderly, to give him their money so he could "invest" it. He would then steal the funds and use them for his own purposes. When these victims later wanted their money back, he would purport to transfer properties to them in exchange, but he never recorded the deeds. On other occasions, as part of the loan application process, appellant would have the victims quitclaim their properties to him. He then sold the properties and kept the sale proceeds.
 {¶ 14} On September 26, 2006, appellant was indicted by the Cuyahoga County Grand Jury in a 135-count indictment for engaging in a pattern of corrupt activity, in violation of R.C. 2923.32; conspiracy to engage in a pattern of corrupt activity, in violation of R.C. 2923.01 and 2923.32; 30 counts of tampering with records, in violation of R.C. 2913.42; 10 counts of securing writings by deception, in violation of R.C. 2913.43; six counts of telecommunications fraud, in violation of R.C. 2913.05; 46 counts of forgery, in violation of R.C. 2913.31; 21 counts of theft by deception when the value of the property stolen was between $5,000 and $100,000, in violation of R.C. 2913.02; 14 counts of theft by deception when the value of the property stolen was $100,000 or more, in violation of R.C. 2913.02; theft beyond the scope of consent when the value of the property stolen was $100,000 or more, in violation of R.C. 2913.02; and six counts of money laundering, in violation of R.C. 1315.55 ("the corrupt activity case").
 {¶ 15} While these two cases were pending in the Cuyahoga County Common Pleas Court, appellant filed a motion for change of venue, arguing that he could not receive a fair trial in Cuyahoga County due to pre-trial publicity. The Ohio Supreme *Page 6 
Court assigned the cases to Judge Eugene Lucci of the Lake County Common Pleas Court pursuant to an order entered on August 24, 2006.
 {¶ 16} The jury trial in the murder conspiracy case began on October 17, 2006. The prosecutor gave his opening statement, and several key witnesses, including Judge Matia and Detective Cesareo, testified. Then, after two days of trial, on October 19, 2006, appellant plead guilty in both cases. In the murder conspiracy case, he plead guilty to four counts of intimidation, felonies of the third degree, and one count of retaliation, a felony of the third degree. In the corrupt activity case, he plead guilty to one count of engaging in a pattern of corrupt activity, a felony of the first degree; one count of tampering with records, a felony of the third degree; one count of forgery, a felony of the fourth degree; one count of theft, a felony of the third degree; one count of uttering, a felony of the fourth degree; one count of securing writings by deception, a felony of the third degree; and one count of telecommunications fraud, a felony of the fourth degree.
 {¶ 17} The matter was set for sentencing on December 1, 2006 at 9:00 a.m. Earlier that morning, although represented by counsel, appellant filed a pro se motion to withdraw his guilty plea. When the trial court brought this motion to defense counsel's attention, counsel stated, "we're gonna withdraw that motion. I'm gonna withdraw it on behalf of the Defendant. So we don't have to have a hearing on it and be heard. We'll withdraw the motion to withdraw the plea." When asked by the court if he agreed with these remarks, appellant said he did.
 {¶ 18} Judge Matia attended the sentencing hearing and spoke as a victim. He advised the court that in sentencing appellant in the past, he had become familiar with *Page 7 
appellant's extensive criminal record, and advised the court that appellant's life work has been to defraud and steal.
 {¶ 19} Judge Matia told the court that in 1995, appellant became angry with another Cuyahoga County Common Pleas Judge Timothy McGinty due to remarks Judge McGinty had made while sentencing appellant's then-girlfriend Attorney Patricia Boychuk in a criminal case she had in his court. Appellant tracked down the Judge to a health club where the Judge works out in downtown Cleveland. Appellant joined the club so he could get near to the Judge. While Judge McGinty was using the bench press, appellant suddenly appeared over him and grabbed the bar Judge McGinty was using, attempting to harass and intimidate him.
 {¶ 20} Judge Matia said that appellant grew up in a family that encourages intimidation of public officials. The Judge said that on the day appellant plead guilty in Judge Lucci's court room, appellant's brother Richard Dudas gave Judge Matia the finger.
 {¶ 21} Judge Matia said appellant actually delivered the funds to the person he believed would kill him; however, the funds were delivered to a detective and not, as appellant intended, to a real hit man.
 {¶ 22} Several of appellant's other victims also spoke at the sentencing. They described how they and their families had been destroyed financially and emotionally by appellant. Their credit was ruined and many were forced into bankruptcy. Cheryl Golic said that appellant had filed false liens on two houses she and her husband owned totaling $32,000. While appellant's guilty plea in the instant case was being negotiated, appellant's counsel assured the prosecutor appellant had released the fraudulent liens. *Page 8 
Following the plea, the prosecutor discovered from the Golics that appellant did not release the liens and in fact refused to do so. The liens were mechanic's liens wherein appellant swore in affidavits that the Golics owed him money for work he had done on two properties that he never performed.
 {¶ 23} Another victim Bruce Limmer testified appellant sold him a house in Parma for $80,000, only to find out that appellant forged the owners' names on the deed as the sellers and never transferred the property to him. Appellant told Mr. Limmer the couple living at the house, the Campbells, were tenants who had defaulted on their rent and told Mr. Limmer to evict them. When he attempted to do so, he learned the Campbells owned the property and that he had been duped.
 {¶ 24} The Campbells were present and told the court that appellant had stalked them, burglarized their home, and attempted to physically harm them.
 {¶ 25} Another victim Dan Mullen testified that appellant had defrauded him and his son out of $500,000, causing Dan to experience the "shame and devastation" of bankruptcy. Appellant's fraud caused Dan's wife to experience a complete mental breakdown.
 {¶ 26} The prosecutor told the court that in the case of CuyahogaCounty Bar Association v. Boychuk, 79 Ohio St.3d 93, 1997-Ohio-403, the Supreme Court suspended Attorney Patricia Boychuk's license to practice law. She had been appellant's girlfriend. The Board of Commisssioners on Grievances and Discipline of the Supreme Court found that she was a battered woman and that appellant had battered her. The Board found Boychuk was addicted to cocaine and that appellant had supplied the drug to her. Beginning in 1992, appellant took over her law practice *Page 9 
without her being aware of what was happening. Appellant falsely held himself out as an attorney, and accepted fees to perform legal work for Boychuk's clients.
 {¶ 27} The prosecutor told the court that appellant has attempted to intimidate his victims to prevent them from coming forward. He said that when appellant is caught by his victims, he typically becomes loud and intimidating, threatening to physically injure them if they come forward.
 {¶ 28} The prosecutor said that while appellant was on probation from Cuyahoga County Common Pleas Judge Richard McMonagle for the unauthorized practice of law and theft in 2001, he stole money or the homes of John and Barbara Hawkins, Cynthia Woide, Evelyn Morman, Mark and Dorothy Fowler, Randy Vecchio, Debbie and Jack Dell, Bruce Limmer, Pat and Mark Campbell, Denice Bates, Linda Williams, Dan Mullen, Steven Ruben, Dan Emrisko, Dawn Clark, Kerry Jorgenson, Gerald Markovic, and J.D. Goddard.
 {¶ 29} During his sentencing, when given an opportunity to speak, appellant did not deny the statements of any of his victims. Instead, he told the court, "Whatever you tell me I have to do, whether it's 1 years [sic] or 100 years, Your Honor, I'm gonna do that. Because I owe it to these people, I owe it to this community and I owe it most to my family."
 {¶ 30} The trial court noted appellant was convicted of theft in Lyndhurst in 1979 and received one year probation. In 1987, he was convicted of three counts of theft in the Willoughby Municipal Court and placed on probation. In 1992, appellant plead guilty to theft in the Lake County Common Pleas Court for an offense he committed in Mentor and received probation. *Page 10 
 {¶ 31} In 1995, appellant plead guilty in the Cuyahoga County Common Pleas Court to three counts of theft, felonies of the third degree. Appellant was sentenced by Judge Thomas Patrick Curran to one year in prison. While appellant was in prison, he filed a pro se motion for shock probation. Judge Curran denied the motion, and appellant decided to seek revenge against the Judge. Appellant solicited fellow inmate Daniel Ott, an informant, to break Judge Curran's hand and offered Ott $2,500 to do it. Ott contacted Detective Thomas Doyle of the Eastlake Police Department and advised him of appellant's efforts to injure Judge Curran. Detective Doyle asked Ott for written proof, and Ott obtained a note from appellant instructing his brother Richard Dudas to pay Ott $2,500 once Ott had handled the matter. Appellant was found guilty by a jury of intimidation against Judge Curran and sentenced to two years in prison.
 {¶ 32} In 2001, appellant was convicted of the unauthorized practice of law in the Cuyahoga County Common Pleas Court. He was given one year probation and "ordered not to participate in any financial institution or related fields." He began another financial transaction the very next day.
 {¶ 33} On September 7, 2004, appellant was convicted of a theft he committed in North Olmsted. He was put on probation by Judge Matia. Appellant's probation was terminated due to a new offense he committed in North Olmsted in 2005. Judge Matia sentenced him to 17 months in prison for that offense and a probation violation. It was in response to that sentence that appellant plotted to murder Judge Matia.
 {¶ 34} In the murder conspiracy case, the court sentenced appellant on each of four counts of intimidation to five years, each term to run concurrently to the others. *Page 11 
The court sentenced him to five years on the retaliation count, to be served consecutively with the intimidation counts, for a total of ten years.
 {¶ 35} In the corrupt activity case, the court sentenced appellant to ten years for engaging in a pattern of corrupt activity, five years for tampering with records, 18 months for forgery, one year for theft, 18 months for uttering, five years for securing writings by deception, and 18 months for telecommunications fraud. The prison terms imposed for forgery, theft, uttering, and telecommunications fraud were to be served concurrently to each other and concurrently to the terms imposed for engaging in a pattern of corrupt activity, tampering with records, and securing records by deception. The terms for engaging in a pattern of corrupt activity, tampering with records, and securing records by deception were to be served consecutively to each other, for a total of 20 years in prison, and consecutively to the prison term in the murder conspiracy case, for a total of 30 years in prison.
 {¶ 36} On December 5, 2006, appellant filed another pro se motion to withdraw his guilty plea, which the trial court denied by order, dated January 3, 2007.
 {¶ 37} Appellant filed a direct appeal of his conviction in this court, and his conviction was affirmed in State v. Dudas, 11th Dist. Nos. 2006-L-267 and 2006-L-268, 2007-Ohio-6739, discretionary appeal not allowed, 117 Ohio St.3d 1458, 2008-Ohio-1635 ("Dudas I").
 {¶ 38} Meanwhile, on December 27, 2006, appellant filed a motion for an order requiring the state to return a stolen laptop computer and his personal and business files, which he alleged had been seized by the state in an illegal search and used against him. The state responded it had not seized appellant's property and was not in *Page 12 
possession of it; rather, the state indicated appellant had left his property in the Golic residence when he moved out. The trial court denied the motion, and appellant appealed that decision in State v.Dudas, 11th Dist. No. 2007-L-074, 2007-Ohio-6731 ("Dudas II"), in which we affirmed the trial court's order. Thereafter, on June 19, 2007, appellant filed a motion to compel the Golics to return his property, which he now alleged they had stolen from him in June, 2005. The trial court denied the motion on September 26, 2007.
 {¶ 39} While Dudas I and Dudas II were pending in this court, on June 29, 2007, appellant filed a petition for post conviction relief. That petition was dismissed by the trial court on August 22, 2007. Appellant appeals the dismissal of his petition, asserting six assignments of error. For his first assignment of error, appellant states:
 {¶ 40} "THE TRIAL COURT ERRED BY FAILING TO MAKE ANY FINDINGS OF FACT BASED UPON THE EVIDENCE PRESENTED AT TRIAL OR IN SUPPORT OF THE PETITION FOR POST-CONVICTION RELIEF, AND BY FAILING TO MAKE ANY CONCLUSIONS OF LAW THAT SPECIFICALLY REFERENCE THE ARGUMENTS RAISED BY APPELLANT, IN DENYING APPELLANT'S PETITION FOR POST CONVICTION RELIEF WITHOUT A HEARING."
 {¶ 41} Under his first assigned error, appellant argues the trial court erred in not entering findings of fact and conclusions of law. We do not agree.
 {¶ 42} R.C. 2953.21(C) provides that if a trial court dismisses a post-conviction petition without a hearing, the court must file findings of fact and conclusions of law in relation to that decision. In interpreting this statute, the Supreme Court of Ohio has held *Page 13 
that the entry of findings and conclusions is mandatory. State ex rel.Konoff v. Moon, 79 Ohio St.3d 211, 212, 1997-Ohio-398.
 {¶ 43} However, the Supreme Court of Ohio has further held that, in order to comply with R.C. 2953.21(C), a trial judge is not always required to issue a separate entry specifically delineating the findings and conclusions. A detailed dismissal judgment will suffice if it is sufficient to indicate to the petitioner the basis for the decision. For example, in State ex rel. Carrion v. Harris (1988), 40 Ohio St. 3d 19, the trial court's judgment stated that the post-conviction petition was denied on the basis of res judicata because the issues raised in the petition could have been asserted in the petitioner's appeal from his conviction. The Carrion court concluded that, even though the trial court's judgment had not been labeled as findings of fact and conclusions of law, its wording was sufficient to serve the same purpose. Id. at 20.
 {¶ 44} The Supreme Court of Ohio reached a similar conclusion inKonoff, supra. In that case, the trial court's judgment stated that the post-conviction petition was denied on the basis that the petitioner was not entitled to be resentenced under the new sentencing statutes because those statutes could not be applied retroactively.
 {¶ 45} This court addressed this issue in State ex rel. Bowens v.Mackey (Sept. 12, 1997), 11th Dist. No. 97-A-0016, 1997 Ohio App. LEXIS 4138. In that case, the trial court dismissed the defendant's petition for post-conviction relief in an entry that provided the following reasons to support the court's holding: (1) relator did not file his post-conviction petition in a timely manner; (2) relator's arguments concerning ineffective assistance of trial counsel had previously been considered in his appeal from the conviction; (3) his allegation of prosecutorial misconduct was unsupported; and (4) *Page 14 
the question of the sufficiency of the evidence presented at trial had also been considered in the appeal. This court held:
 {¶ 46} "Taken as a whole, respondent's dismissal judgment sufficiently delineates the basis of the decision to enable relator to prosecute an appeal from the judgment." Id. at *4.
 {¶ 47} In the instant case, the trial court in its dismissal entry noted that in appellant's petition, he alleged his constitutional rights had been violated because he was set up by the police. The court stated that appellant supported his petition with letters from alleged witnesses that were "either not sworn or not signed." The court also stated that appellant "was aware of this alleged evidence prior to his sentencing, and failed to raise this issue at that time." The court concluded appellant had not alleged any substantive grounds for relief and dismissed the petition.
 {¶ 48} We hold that the dismissal judgment sufficiently delineated the basis of the decision to allow appellant to prosecute an appeal from the judgment and satisfied the requirements of R.C. 2953.21.Carrion, supra; Mackey, supra.
 {¶ 49} Appellant's first assignment of error is not well taken.
 {¶ 50} For his second assignment of error, appellant asserts:
 {¶ 51} "TRIAL COURT ERRED BY FAILING TO ACKNOWLEDGE THE FACT THAT THE PROSECUTOR AND STATE HAD KNOWLEDGE THAT PERJURY AND FRAUD WERE COMMITTED AGAINST APPELLANAT [SIC], THAT THE LAKE COUNTY CRIME LAB ERRED BY ALLEGING THAT APPELLANT FORGED DOCUMENT SIGNATURES." *Page 15 
 {¶ 52} Under appellant's second assignment of error, he argues the trial court erred in failing to acknowledge the state knew that perjury and fraud had been committed and that the Lake County Crime Lab had erred in its conclusion that Harmon's purported signature on the November 23, 2005 note had been forged. However, appellant points to no evidence in the record that the state had such knowledge or that the Crime Lab erred in its conclusion. An appellate court in determining the existence of error is limited to a review of the record. State v.Sheldon (Dec. 31, 1986), 11th Dist. No. 3695, 1986 Ohio App. LEXIS 9608, *2; Schick v. Cincinnati (1927), 116 Ohio St. 16, at paragraph three of the syllabus. Without any evidence in support of appellant's argument, there is nothing for us to consider. On appeal it is the appellant's responsibility to support his argument by evidence in the record that supports his or her assigned errors. City of Columbus v. Hodge (1987),37 Ohio App.3d 68.
 {¶ 53} Appellant's second assignment of error is not well taken.
 {¶ 54} Appellant asserts the following for his third, fourth, fifth, and sixth assignments of error:
 {¶ 55} "[3.] THE TRIAL COURT ERRED BY DENYING APPELLANT'S PETITION FOR POST CONVICTION RELIEF.
 {¶ 56} "[4.] THE TRIAL COURT ERRED BY FAILING TO MAKE FINDINGS OF FACTS [SIC] AND CONCLUSIONS OF LAW BASED UPON THE EVIDENCE PRESENTED IN THE POST CONVICTION RELIEF SPECIFICALLY REFERENCED [SIC] TO APPELLANT'S ARGUMENT OF AN UNLAWFUL SEARCH AND SEIZURE OF EVIDENCE OUTSIDE THE SCOPE OF THE SEARCH WARRANT AS POLICE, *Page 16 
DETECTIVES, [SIC] ENTERED OTHER ANNEXED PROPERTY NOT DESCRIBED WITHING [SIC] THE BODY OF THE WARRANT, THEREAFTER ILLEGALLY SEIZED RECORDS, DOCUMENTS, REPORTS AND COMPUTER FROM SAID PROPERTY OF APPELLANT'S MENTOR HOME OR OFFICE KNOWN AS YOUR CHOICE HOMES INC; FALLS CLOSING INC., OR FALLS FUNDING INC. IN VIOLATION OF THE UNITED STATES CONSTITUTION FOURTH [SIC] AMENDMENT APPLICABLE TO STATE OFFICIALS THROUGH THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.
 {¶ 57} "[5.] THE TRIAL COURT ERRED BY DENYING APPELLANTS [SIC] PETITION FOR POST CONVICTION RELIEF IN REFERENCE TO INEFFECTIVE ABSENCE [SIC] OF COUNSEL AS WAS EVIDENCE [SIC] BY PROOF OF THE LACK IN COUNSELS [SIC] JPERFORMANCE [SIC] AS EXHIBITED IN CLAIMS AS FOLLOWS: CLAIM 1 THROUGH 54 OF THE APPELLANTS [SIC] POST CONVICTION RELIEF, TAKING INTO ACCOUNT THAT APPELLANT FILED OVER 30 PRO SE MOTIONS BECAUSE COUNSEL PROMISED TO FILE THESE MOTIONS BUT FAILED TO DO SO THUS FORCING APPELLANT TO FILE THEM PRO SE, EVEN THOUGH APPELLANT HAD PAID COUNSEL EXCESSIVE FEES TO REPRESENT HIM.
 {¶ 58} "[6.] THE TRIAL COURT ERRED BY DENYING POST-CONVICTION RELIEF FOR INEFFECTIVE ASSISTANCE OF COUNSEL. APPELLANT TOLD COUNSEL TO WITHDRAW PLEA AT SENTENCING AND TO BE SURE COUNSEL FILES THE MOTION TO WITHDRAW GUILTY PLEA. ON [SIC] COUNSELS [SIC] LETTER HEAD [SIC] NOT TO FILE THE PRO SE MOTION BECAUSE THE COURT *Page 17 
ISSUED A RULING THAT `NO PRO SE MOTIONS WILL BE ENTERTAINED BY THIS COURT WHILE APPELLANT HAD COUNSEL.' COUNSEL NONETHELESS FILED THE PRO SE MOTIONS."
 {¶ 59} Because these assignments of error are interrelated, they will be considered together. Under his third assigned error, appellant suggests he was entitled to a hearing because he had demonstrated the existence of issues concerning whether he was set up by the state and whether his files were seized as a result of an unlawful search.
 {¶ 60} R.C. 2953.21 provides in part:
 {¶ 61} "(A)(1)(a) Any person who has been convicted of a criminal offense *** and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States *** may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. ***
 {¶ 62} "***
 {¶ 63} "(E) Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues even if a direct appeal of the case is pending. ***"
 {¶ 64} In State v Noling, 11th Dist. No. 98-P-0049, 2003-Ohio-5008, this court held:
 {¶ 65} "*** [A] defendant challenging his conviction through a petition for postconviction relief is not automatically entitled to a hearing. State v. Calhoun, *Page 18 86 Ohio St.3d 279, 282, 1999-Ohio-102, ***. `Only after he meets his initial burden to show substantive grounds for relief from the files and records of the case and, often, evidentiary materials dehors the record is a hearing required.' State v. Davie (Sept. 25, 1998), 11th Dist. No. 97-T-0175, 1998 Ohio App. LEXIS 4540 ***, at [*6]. Stated differently, `*** before a hearing is granted, "the petitioner bears the initial burden to submit evidentiary documents containing sufficient operativefacts to demonstrate ***"' that errors did occur and that the errors resulted in prejudice. (Emphasis sic.) Calhoun at 283, quoting State v.Jackson (1980), 64 Ohio St.2d 107 ***, syllabus. Moreover, `*** if the court can resolve the averments contained within the petitioner's request based upon the material contained within the petition, and the files and records, it may properly dismiss the matter without conducting a hearing.' State v. Hill (June 16, 1995), 11th Dist. No. 94-T-5116, 1995 Ohio App. LEXIS 2684 ***, at [*4]." Id. at ¶ 22.
 {¶ 66} In cases where no hearing was held, an appellate court reviews the trial court's decision to grant or deny a petition for postconviction relief de novo. See State v. Jordan, 11th Dist. No. 2006-T-0087, 2007-Ohio-1067, at ¶ 8.
 {¶ 67} The record demonstrates that appellant was aware of his set up and unlawful search claims long before he plead guilty on October 19, 2006. As a result, on the face of his petition, these issues were barred by res judicata.
 {¶ 68} As to the search issue, we note there is no evidence in the record that any of appellant's property was seized in a search by the police. For this reason alone, appellant was not entitled to a hearing regarding this aspect of his motion. Noling, supra. In any event, after the state represented to the trial court that it had not seized appellant's property and that he had left it behind when he left the Golics' residence, on *Page 19 
June 19, 2007, appellant filed a motion for an order to compel the Golics to return his property, this time alleging they had stolen it in June, 2005.
 {¶ 69} As to appellant's argument that he was set up, on November 23, 2005, he told his girlfriend he had done "the reverse" with respect to a note. This was a reference to the fact that in the past appellant had gotten in trouble by a note he had written. This time, appellant wrote a note, dated November 23, 2005, which bears the forged signature of Harmon, stating Harmon had attempted to set up appellant.
 {¶ 70} Appellant also submitted as Exhibit Z to his petition a list of defense witnesses he had prepared for his attorney prior to September 26, 2006. Appellant includes Ronald Wamsley on his list, who, appellant noted to his attorney at that time, "can prove [appellant's victim Tom] Platzer set me up." Appellant also included Nate Bozeman as a potential witness. Appellant noted at that time that this witness would testify that Harmon had said he set up appellant while they were in the medical holding cell.
 {¶ 71} Finally, appellant included as an exhibit to his petition a letter to him from a fellow inmate Joe L.N.U., dated July 13, 2006. In the letter Joe agrees to testify for appellant and to "tell them just how [appellant] got set up." Appellant wrote a note to the trial court on this letter attached to his petition, stating that it is "proof of set up [sic]."
 {¶ 72} Thus, based on the record and the petition, appellant was aware of his claims based on set up and illegal search long before he entered his guilty plea. He failed to assert either issue in trial or on the direct appeal of his conviction. As a result, these issues are barred by res judicata. *Page 20 
 {¶ 73} "`Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant *** from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment.'" (Emphasis deleted.)State v. Szefcyk (1996), 77 Ohio St.3d 93, 95, 1996-Ohio-337, quotingState v. Perry (1967), 10 Ohio St.2d 175, paragraph nine of the syllabus.
 {¶ 74} "For a defendant to avoid dismissal of the petition by res judicata, the evidence supporting the claims in the petition must be competent, relevant, and material evidence outside the trial court's record, and it must not be evidence that existed or was available for use at the time of trial. *** To overcome the res judicata bar, evidence offered dehors the record must demonstrate that the petitioner could not have appealed the constitutional claim based upon the information in the original record.'" State v. Adams, 11th Dist. No. 2003-T-0064,2005-Ohio-348, at ¶ 39, quoting State v. Lawson (1995),103 Ohio App.3d 307, 315.
 {¶ 75} The trial court stated the following in its August 27, 2007 dismissal entry:
 {¶ 76} "The court has considered the defendant's petition for post conviction relief ***. In addition to the petition, the court has considered all the files and records pertaining to the proceedings against the petitioner, including but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of court, and the court reporter's transcript."
 {¶ 77} "*** *Page 21 
 {¶ 78} "Additionally, *** the defendant was aware of this alleged evidence prior to his sentencing, and failed to raise this issue at that time."
 {¶ 79} Appellant's claim that he was set up was based on facts that were known to him prior to the time he entered his guilty plea. He did not present any competent, relevant, and material evidence outside the record that did not exist or was unavailable for use at the time of trial. The letter appellant submitted in support of his petition, allegedly written by Harmon on January 27, 2007, stating detectives wanted to set up appellant, does not save his claim of set up because appellant was aware of the alleged set up long before he plead guilty. This is demonstrated by the fact that appellant actually wrote the Harmon note, dated November 23, 2005, in which Harmon purports to apologize for attempting to set up appellant. In fact, appellant was aware of every challenge referenced in his petition before he entered his guilty plea. By entering that plea and by failing to litigate these issues in trial or to raise them in his direct appeal, he was barred by res judicata from asserting them in his petition.
 {¶ 80} Further, by pleading guilty, appellant waived the right to assert any of the issues he raised in his petition. As we held inDudas II:
 {¶ 81} "By entering his plea of guilty, appellant waived the right to challenge in subsequent proceedings the legality of a search and seizure. Crocket v. Haskins (1965), 2 Ohio St.2d 322, 323 ***;Villasino v. Maxwell (1963), 174 Ohio St. 483, 484 ***; Poe v.Maxwell (1964), 177 Ohio St. 28, 29 ***.
 {¶ 82} "The United States Supreme Court has held: `When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of *Page 22 
constitutional rights that occurred prior to the entry of the guilty plea.' Tollett v. Henderson (1973), 411 U.S. 258, 267 ***.
 {¶ 83} "The Supreme Court in Lefkowitz v. Newsome (1975), 420 U.S. 283
***, further held:
 {¶ 84} `*** Once the defendant chooses to bypass the orderly procedure for litigating his constitutional claims in order to take the benefits, if any, of a plea of guilty, the State acquires a legitimate expectation of finality in the conviction thereby obtained. *** It is in this sense, therefore, that ordinarily "a guilty plea represents a break in the chain of events which has preceded it in the criminal process."' Id. at 289, quoting Tollett, supra, at 267. (Citations omitted.)
 {¶ 85} "Thus, by entering his guilty plea in this case, appellant waived the right to assert any challenge based upon the alleged violation of his rights under the Fourth Amendment." Dudas II at ¶ 10-14.
 {¶ 86} The United States Supreme Court held in Haring v. Prosise
(1983), 462 U.S. 306:
 {¶ 87} "`[A] counseled plea of guilty is an admission of factual guilt so reliable that *** it quite validly removes the issue of factual guilt from the case. *** A guilty plea, therefore, simply renders irrelevant those constitutional violations not logically inconsistent with the valid establishment of factual guilt and which do not stand in the way of conviction, if factual guilt is validly established.'" (Emphasis sic.) Id. at 321, quoting, Menna v. New York (1975), 423 U.S. 61, 62-63, n. 2. *Page 23 
 {¶ 88} By entering his guilty plea, appellant's constitutional claims, each of which occurred before the entry of his guilty plea, are irrelevant to appellant's factual guilt and cannot provide a basis for postconviction relief.
 {¶ 89} In his third and fourth assignments of error, appellant argues his attorney provided ineffective assistance. The standard of review for ineffective assistance of counsel is whether the representation of trial counsel fell below an objective standard of reasonableness and whether the defendant was prejudiced as a result of the deficient performance. The defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington (1984), 466 U.S. 668. In the context of a guilty plea, the defendant must demonstrate that there is a reasonable probability that, but for his counsel's error, he would not have plead guilty and would have insisted on going to trial.Hill v. Lockhart (1985), 474 U.S. 52, 58-59.
 {¶ 90} Appellant argues that his trial counsel's failure to obtain discovery concerning Tom Platzer's payment of $300 to the undercover detective and his failure to file a suppression motion regarding the alleged search and seizure of his laptop computer and files resulted in the ineffective assistance of counsel.
 {¶ 91} However, there is no evidence in the record demonstrating that counsel failed to conduct such discovery or if he failed to do so, how appellant was thereby prejudiced. We note that appellant's counsel did request and obtain discovery from the state. Further, as noted supra, there is no evidence in the record that the state seized appellant's property through a search. In fact, the state represented to the court that it never seized this property. The warrant submitted by appellant with his petition, while *Page 24 
referencing facts occurring in 2001, is undated and unsigned and provides no evidence that any search resulted in the seizure of his property.
 {¶ 92} For his fifth assignment of error, appellant states he filed more than 30 pro se motions because his attorney failed to do so. First, we note appellant failed to offer any argument in support of this contention, as required by App.R. 16(A), and the argument is therefore without merit. However, we note from the docket that, prior to pleading guilty, appellant only filed two pro se motions. A defendant represented by an attorney is not entitled to file pro se motions. Moreover, there is no evidence in the record concerning the reasons for such filings or any resulting prejudice. In any event, because appellant concedes the motions were filed, he has not demonstrated prejudice.
 {¶ 93} Under this assigned error, appellant lists the following alleged failings of his trial attorney: (1) he ignored "certain key pieces of evidence," which appellant does not specify on appeal; (2) he "failed to provide numerous exculpatory documents, which are not specified in appellant's brief;" (3) he failed to contact witnesses to appellant's "set up," although, appellant argues, he had provided their names to counsel; and (4) he failed to investigate the information provided by appellant that the state did not have a valid search warrant. There is no evidence in the record to support any of these claims.
 {¶ 94} Under his sixth assigned error, appellant argues that his attorney failed to follow his instructions to put his pro se motion to withdraw his guilty plea on his letterhead before filing it and instead filed it on December 1, 2006 as written as a pro se motion. Since appellant admits that the motion was filed and that, when asked by the trial court prior to sentencing if he wished to withdraw his motion to withdraw, he said he did, we perceive no deficiency on the part of his counsel. Even if we were to consider *Page 25 
counsel's alleged failure to put the motion on his letterhead as ineffective assistance, appellant does not demonstrate or even suggest how he could have been prejudiced by this.
 {¶ 95} In any event, as discussed supra, appellant's claim of ineffective assistance of counsel is irrelevant since counsel's alleged deficiencies occurred prior to the entry of appellant's guilty plea.Haring, supra. By failing to assert ineffective assistance of counsel either at trial or on direct appeal of his conviction, appellant was barred by res judicata from asserting it in his petition.Szefcyk, supra.
 {¶ 96} We therefore hold the trial court did not err in dismissing appellant's petition for postconviction relief.
 {¶ 97} Appellants third, fourth, fifth, and sixth assignments of error are not well taken.
 {¶ 98} For the reasons stated in the Opinion of this court, the assignments of error are without merit, and it is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.
CYNTHIA WESTCOTT RICE, J., MARY JANE TRAPP, J., TIMOTHY P. CANNON, J., concur. *Page 1